ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| EFRAIN PABÓN ALICEA<br><br>Parte Apelante<br><br>v.<br><br>ABLE SALES COMPANY, INC. & FULANO DE TAL<br><br>Parte Apelada | KLAN202400553 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso Núm.: ISCI201800560<br><br>Sobre: Reclamación Laboral al amparo de: Ley 80 del 30 de mayo de 1976, según enm. (Ley #2 Procedimiento Sumario) |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Rodríguez Flores

Rodríguez Flores, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 26 de febrero de 2025.

El 6 de junio de 2024, el señor Efraín Pabón Alicea (apelante o señor Pabón Alicea) instó el recurso de apelación de epígrafe. Solicita que revoquemos una *Sentencia* emitida el 25 de marzo de 2024, y notificada y archivada en autos el 17 de abril de 2024, por el Tribunal de Primera Instancia (TPI), Sala Superior de Mayagüez. En dicha determinación, el foro primario declaró No Ha Lugar la querella del caso de epígrafe y, consecuentemente, ordenó el cierre definitivo y archivo, con perjuicio, el pleito de marras.[1]

Posteriormente, el señor Pabón Alicea radicó un *Alegato Suplementario de Efraín Pabón Alicea* el 30 de octubre de 2024.

Por su parte, el 19 de diciembre de 2024, Able Sales Company, Inc. (parte apelada o Able Sales) presentó un *Alegato de la Parte Apelada.*

---

[1] *Sentencia*, Apéndice del recurso, págs. 234-252.

Examinados los escritos a la luz del derecho aplicable, la transcripción de prueba oral del juicio en su fondo y por los fundamentos que expondremos a continuación, *se confirma* la *Sentencia* apelada.

**I.**

El 11 de julio de 2018, el señor Pabón Alicea presentó una *Querella* en contra de Able Sales por despido injustificado mediante el procedimiento sumario.[2] Alegó que fue despedido ilegal e injustificadamente de Able Sales el 16 de marzo de 2018, luego de haber trabajado en dicha entidad desde el año 1993. Ante ello, reclamó la cantidad de $90,563.27 en concepto de indemnización por despido injustificado, al igual que el pago de costas, gastos y honorarios de abogado.

Posteriormente, Able Sales radicó una *Contestación a Querella* donde sostuvo que el señor Pabón Alicea comenzó a trabajar en la compañía el 1 de febrero de 1994, y que el despido ocurrió el 16 de marzo de 2018.[3] Expuso también que dicho despido fue por justa causa como parte de una reorganización que conllevó una reducción del personal ante la pérdida de un cliente importante; a saber, Pepsi.

Luego de varios trámites procesales, Able Sales presentó una *Moción Solicitando Sentencia Sumaria* el 25 de noviembre de 2019.[4] Por medio de esta, Able Sales reiteró que el despido del señor Pabón Alicea fue el resultado de una reorganización *bona fide* de las operaciones de la empresa como esfuerzo para reducir gastos, después de haber perdido un contrato millonario con Pepsi.

Por su parte, el señor Pabón Alicea radicó una *Oposición a Moción solicitando Sentencia Sumaria.*[5]

---

[2] *Querella*, *Íd.*, págs. 1-2.
[3] *Contestación a Querella*, *Íd.*, págs. 3-7.
[4] *Moción Solicitando Sentencia Sumaria*, *Íd.*, págs. 8-203.
[5] *Sentencia*, Apéndice de la oposición al recurso, págs. 3-4 (se toma conocimiento de este hecho procesal).

El foro primario emitió una *Resolución* el 11 de septiembre de 2020 en la que denegó la solicitud de sentencia sumaria presentada por Able Sales.[6] Fundamentó su determinación en que era necesario la celebración de una vista evidenciaria para resolver la verdadera causa del despido en cuestión.

Insatisfecha, Able Sales presentó una *Moción de Reconsideración*, la cual fue declarada No Ha Lugar por el foro primario.[7]

Inconforme con dicha determinación, Able Sales radicó un recurso de apelación ante este Tribunal.[8]

El 14 de septiembre de 2021, un panel hermano de este Tribunal emitió una *Sentencia* en la que modificó la *Resolución* del TPI, a los efectos de puntualizar los hechos en controversia, y así modificada la confirmó.[9]

---

[6] *Íd.*, pág. 4 (se toma conocimiento judicial de este hecho procesal).
[7] *Íd.*, pág. 6 (se toma conocimiento judicial de este hecho procesal).
[8] *Íd.* (se toma conocimiento judicial de este hecho procesal).
[9] *Íd.*, págs. 1-22. Los hechos en controversia que determinó un panel hermano de este Tribunal fueron los siguientes:

> 1. Si la relación comercial que existía entre Able Sales y Pepsi fue una que duró varios años, durante los que Pepsi se convirtió en uno de los clientes más importantes de Able Sales.
>
> 2. Si la facturación anual de Pepsi representaba para Able Sales una **ganancia** que sobrepasaba el millón de dólares.
>
> 3. Si el contrato entre Pepsi y Able Sales generaba ganancias de sobre más de dos millones de dólares por concepto de almacenaje y manejo de mercancía a la planta de Cidra.
>
> 4. Si la pérdida de dicho contrato tuvo un impacto significativo en la empresa que requiriera una reorganización de sus operaciones.
>
> 5. Si como resultado de la decisión de Pepsi de cerrar sus operaciones, Able Sales y Pepsi suscribieron lo que sería la última enmienda al *"Master service agreement"* de enero del año 2015 suscrito por las partes, poniendo fin a una relación de varios años y estableciendo como fecha de terminación el 13 de abril de 2018.
>
> 6. Si aún cuando el contrato entre Able Sales y Pepsi finalizó el 13 de abril de 2018, existían algunos aspectos de la relación comercial que quedaban pendientes de finiquitar, de manera tal que Able Sales continuó devengando ingresos adicionales relacionados a tal contrato hasta por lo menos junio de 2018. Ello por concepto de algunos trámites pendientes de finalizar en el terminal de Ponce.
>
> 7. Si la cancelación del contrato de Pepsi, y por consiguiente, la pérdida del ingreso y/o ganancia que Able Sales había anticipado obtendría de la cuenta de Pepsi, obligó a Able Sales a realizar un análisis para identificar posiciones que podían ser eliminadas sin

Devuelto el caso al foro *a quo,* las partes radicaron un *Tercer Informe Enmendado de Conferencia Preliminar entre Abogados* por el que estipularon diecisiete (17) hechos como incontrovertidos.[10]

Después de varios trámites procesales, el TPI celebró un juicio en su fondo los días 29 y 30 de enero de 2024, el cual quedó recogido en la TPO.[11] La prueba testifical de la parte apelante consistió en el

---

afectar la operación del negocio e identificar métodos de ahorros y reducción de gastos. Ello, para realizar una restructuración *bona fide* de todas sus operaciones encaminadas a reducir gastos operacionales.

8. Si Able Salesrealizó [sic] una restructuración bona fide de todas sus áreas y operaciones y si como parte de la misma eliminó ciertas posiciones, congeló otras, negoció con contratistas para reducir el costo de sus servicios, redujo los niveles de inventario, canceló contratos con contratistas, redujo la aportación patronal al plan de retiro y el tope de las bonificaciones a empleados, eliminó la bonificación por asistencia perfecta y el beneficio del día de cumpleaños libre con paga, y otras medidas.

9. Si la reducción de la plantilla laboral en términos de plazas congeladas y posiciones eliminadas, fue realmente objeto de un riguroso análisis previo a su implementación para poder cuantificar el impacto o ahorro de la misma sin que se viera afectada la operación y tomando como base criterios objetivos como funciones, destrezas, experiencia, antigüedad y necesidades de servicios.

10. Si esta medida tomada fue basada en una expectativa de un ahorro aproximado de cerca de $944,706.23.

11. Si la reducción de la plantilla laboral se llevó a cabo el 16 de marzo de 2018, conllevando la eliminación de seis (6) posiciones, entre ellas la de Supervisor de Ventas que ocupaba el querellante. No siendo el querellante el único empleado despedido.

12. Si las posiciones que ocupaba el querellante fueron ocupadas y las funciones que este desempeñaba fueron asumidas por su supervisor inmediato.

13. Si las funciones que desempeñaba el querellante eran las consignadas en el memorando fechado 16 de enero de 2018 que este le sometiera a su supervisor inmediato.

14. Si el querellante era el único empleado dentro de su clasificación ocupacional, por lo que Able Sales no retuvo a ningún otro empleado de menor antigüedad dentro de dicha clasificación ocupacional.

15. Si la pérdida del contrato entre Pepsi y Able Sales realmente amenazó la continuidad de la empresa, de manera que la merma de ingresos o ganancias pueda considerarse como justa causa para despedir al señor Pabón.

16. Si existía un puesto que pudo habérsele asignado al señor Pabón que respetara el mandato de retener empleados con mayor antigüedad.

*Íd.,* págs. 20-21. (Énfasis suplido en el original).

[10] *Íd.*, págs. 204-233.
[11] TPO de los días 29 y 30 de enero de 2024.

propio testimonio del querellante, el señor Pabón Alicea (Supervisor del Área Norte Álamo Bakery),[12] mientras que los testigos de Able Sales fueron la licenciada Román Rivera (Dirigía y brindaba servicios de consultoría al Departamento de Recursos Humanos de Able Sales)[13] y la señora María Félix Pereira (señora Félix Pereira) (Vicepresidenta de la División Industrial).[14]

Posteriormente, el foro primario emitió una *Sentencia* el 25 de marzo de 2024 por la que desestimó la querella instada en el caso de epígrafe, y ordenó el cierre definitivo y archivo, con perjuicio, del pleito. Además, emitió las siguientes determinaciones de hechos:

1. Efraín Pabón Alicea es mayor de edad, con dirección en la Urb. Vista del Canal, calle A#29, Cabo Rojo.

2. Able Sales Company, Inc. es una corporación con capacidad para demandar y ser demandada con dirección P.O. Box *11946* Caparra Heights Station, San Juan, PR 00922-1946.

3. Entre Pepsi Cola Manufacturing International Limited y Able existía un contrato que las partes acordaron dar por terminado el 13 de abril de 2018.

4. Del documento suscrito el 28 de febrero de 2018 por Martin Chacin en representación de Pepsi y aceptado por María Félix, vicepresidenta de la División Industrial de Able, surge, y, citamos textualmente:

   *"We refer to our recent conversation in relation to the service provided by Able Sales Company, Inc (Supplier) pursuant to the Master Service Agreement dated 1st Januriy [sic], 2015 (the Agreement) made between Pepsi Cola Manufacturing International Limited (PCMIL) and Supplier.*

   *i. We understand that the parties have hereby agreed the following:*

   *1. The Statement Work #2 dated 1st January 2017 as amended and made between PCMIL and Supplier is hereby extended until 13th April 2018 and;*

   *2. Notwithstanding the terms of clause 3.1 of the Agreement, Supplier hereby accepts notice of termination of the Agreement effective from 13th April 2018."*

5. Able Sales Company es una empresa que lleva más de 40 años en el mercado.

---

[12] TPO del 30 de enero de 2024, pág. 8, L 7-9.
[13] TPO del 29 de enero de 2024, pág. 13, L 4-20.
[14] *Íd.*, pág. 78, L 10-16.

6. El querellante trabajó para la querellada mediante un contrato por tiempo indeterminado desde el 1ro. [sic] de febrero de 1994 hasta el 16 de marzo de 2018 cuando fue despedido.

7. El salario más alto devengado por el querellante fue de $46,600.00 anuales.

8. Al momento del despido, el querellante ocupaba el puesto de Supervisor de Ventas en de [sic] Álamo Caribe, subdivisión de Able Sales.

9. Luego de la pérdida de Pepsi como cliente, durante el año 2018, en Able Sales Company no hubo cierre parcial, temporero ni total de operaciones.

10. En el año 2018 Able le pagó bono de navidad a los empleados con derecho a recibirlo.

11. Entre los clientes de Able figuran panaderías, manufactureras industriales, farmacéuticas y compañías multinacionales localizadas en Puerto Rico.

12. El querellante no trabajaba directamente con Pepsi.

13. La posición de supervisor de ventas que ocupaba el querellante al momento del despido fue eliminada.

14. El querellante no fue el único empleado despedido en marzo de 2018.

15. Entre Able y Pepsi existía un acuerdo de confidencialidad (*Confidentially and Individual Liability Release Agreement).*

16. El 16 de febrero de 2018, periódicos locales publicaron el cierre de la planta de Pepsi en Cidra.

17. El supervisor inmediato del querellante al momento del despido era el Sr. Juan Del Corral, Gerente General de Álamo Caribe Bakery.

18. El querellante nunca ocupó la posición de vendedor, aunque cubría las vacaciones de los vendedores.

19. De prosperar la causa de acción, la indemnización al querellante por concepto de mesada sería $80,810.00.

Evaluada la prueba presentada y admitida en evidencia, este Tribunal hace las siguientes determinaciones de hechos:

20. Por más de veinte (20) años, entre Pepsi y Able Sales existió un contrato de servicios, por virtud del cual la Querellada le prestaba, entre otros servicios de almacenaje ("warehousing") y también recibo y traslado de mercancía desde el muelle.

21. El contrato de servicios entre Pepsi y Able Sales se negociaba anualmente. El término estuvo siendo renovado anualmente por todos esos años, hasta el 2018, cuando Pepsi decidió cerrar operaciones en Puerto Rico y canceló el contrato de servicios.

22. Pepsi fue el cliente más importante de Able Sales por muchos años, con una facturación anual millonaria.

23. La cancelación del contrato de Pepsi no fue previamente notificada a Able Sales ni ésta participó de la misma, habiéndola tomado por sorpresa.

24. El Presidente y Vice Presidente del Departamento Industrial de Able Sales, eran quienes atendían, negociaban y estaban a cargo personalmente de la cuenta de Pepsi.

25. Able Sales se enteró del cierre de operaciones de Pepsi en Puerto Rico, por los medios de comunicación, ya que el cliente no les había informado.

26. El cierre de operaciones de Pepsi en Puerto Rico, [sic] conllevó la cancelación del contrato de servicios que por muchos años tuvo con Able Sales.

27. La facturación de Pepsi incluía una partida por concepto de almacenaje ("warehouse"). Dicha partida representaba aproximadamente un 40% de la facturación total de Able Sales a sus clientes por servicios de almacenajes.

28. Aunque Able Sales tenía la fecha de cancelación del contrato de servicio, y tiene al presente otros clientes importantes, la facturación de ningún otro cliente era similar a la de Pepsi. Able Sales no logró sustituir la facturación de Pepsi con otro cliente.

29. Durante el año 2016 y el 2017, la facturación de Able Sales a Pepsi sobrepasó el millón de dólares. La facturación del año 2018, [sic] fue menor, ya que en ese año se canceló el contrato. Durante el año 2018, Able Sales le facturó a Pepsi para el período [sic] comprendido entre enero de 2018 y julio de 2018 únicamente.

30. La pérdida de la cuenta de Pepsi, le representó a Able Sales una pérdida sustancial en las ganancias que había anticipado recibiría, por la facturación a dicho cliente. Ante este hecho, Able Sales decidió reorganizar sus operaciones para reducir gastos operacionales y evitar un impacto adverso.

31. La reorganización de Able Sales incluyó distintas divisiones y/o departamentos, entre ellos, Álamo Caribe, así como también a sus corporaciones relacionadas y/o afiliadas.

32. Able Sales no tuvo injerencia ni participación alguna en la determinación de Pepsi de cancelar el contrato de servicios, como resultado de la decisión de cerrar operaciones en Puerto Rico.

33. Considerando que, Pepsi fue cliente por muchos años y que, anualmente se renovaba el contrato de servicios, la facturación de Pepsi ya había sido tomada en consideración en el presupuesto de la División Industrial, cuando se enteró perdería el cliente.

34. Mediante la reorganización de sus operaciones, Able Sales pretendió obtener un ahorro en gastos operacionales para evitar el impacto adverso que la pérdida de su cliente más importante pudiera representarle.

35. A raíz de advenir en conocimiento de la pérdida de la cuenta más importante, el Presidente de Able Sales le

solicitó a la Lcda. Neyza Román, consultora en el área de Recursos Humanos y persona a cargo de dicho departamento, que identificara medidas para ahorrar gastos operacionales.

36. La Lcda. Román realizó un análisis que tomó en consideración posiciones regulares que pudieran ser redundantes y susceptibles de ser eliminadas, así como también la congelación de plazas vacantes, buscando así obtener un ahorro en gastos, sin afectar la operación del negocio y la eliminación y/o reducción de beneficios a los empleados.

37. La Lcda. Román evaluó y recomendó diferentes alternativas de ahorro, las cuales fueron implementadas como parte de la reorganización.

38. Como parte de su reorganización, Able Sales canceló contratos de empleo temporeros, congeló plazas que estaban vacantes, detuvo temporeramente el reclutamiento para nuevas posiciones, eliminó posiciones, renegoció costos de los contratos con contratistas independientes, se redujo el número de contratistas independientes y redujo el área de almacenaje que tenía contratada, entre otras medidas para reducir gastos y obtener ahorros.

39. Como parte de la reorganización, los beneficios concedidos a los empleados también sufrieron cambios. Entre estos, Able Sales redujo la aportación patronal a la cubierta de plan médico, la aportación patronal al plan de retiro estableció un tope al bono y/o pago que se concedía basado en metas y resultados de las evaluaciones; eliminó la bonificación por la asistencia y se estableció que el día de cumpleaños podía disfrutarse, pero con cargo a vacaciones.

40. La reducción de personal, mediante la eliminación de posiciones y congelación de plazas, fue una de las varias medidas tomadas como parte de la reorganización.

41. La posición que ocupaba el Querellante, Supervisor de Ventas, fue una de las que fueron eliminadas como parte de la reducción de personal, que formó parte de la reorganización *bona fide* de las operaciones de Able Sales y sus afiliadas.

42. Able Sales no retuvo a personal alguno en la misma clasificación ocupacional del Querellante, ya que éste era el único empleado en dicha clasificación.

43. La Lcda. Román no fue la única que participó en el análisis de medidas que conformaron la reorganización, ya que el Presidente de Able Sales y la persona a cargo de finanzas participaron y/o aportaron al proceso.

44. La Sra. María Félix, como Vicepresidente de Ventas Industriales, personalmente atendió la cuenta de Pepsi por muchos años y participó de la negociación y las renovaciones anuales de dicho contrato de servicios. La Sra. Félix conocía la facturación que generaba ese cliente, la cual se tomaba en consideración al preparar el presupuesto de su división.

45. En Álamo Caribe no existía una posición de "Key Accountant Supervisor". Las funciones que desempeñaba

el Querellante como Supervisor de Vendedores, eran distintas a las que desempeñaba un "Key Accountant Supervisor", plaza que existía en una corporación relacionada.

46. Entre los servicios que Able Sales le facturaba a Pepsi, estaba el manejo del terminal en el muelle en donde se recibía la mercancía y/o productos de Pepsi.

47. A la fecha de efectividad de la cancelación del contrato de Pepsi, 13 de abril de 2018, mercancía por barco venía en tránsito, por lo que, aun cuando el contrato se canceló en abril de 2018, Able Sales facturó por los servicios relacionados al recibo de mercancía en el muelle, hasta julio de 2018.[15]

Insatisfecho, el señor Pabón Alicea presentó una *Moción de Reconsideración* el 2 de mayo de 2024,[16] la cual el foro primario denegó.[17]

Inconforme con dicho dictamen, el señor Pabón Alicea presentó un recurso de apelación ante esta Curia el 6 de junio de 2024 y señaló que el TPI cometió los siguientes errores:

Primer error: Erró el Tribunal de Primera Instancia en la apreciación de la prueba, la adjudicación de credibilidad y la determinación de los hechos, incurriendo en error, ya que no le otorgó el valor probatorio correcto a la prueba testifical y documental presentada en el juicio.

Segundo error: Erró el Tribunal de Primera Instancia al concluir que el despido del apelante fue justificado.

Tercer error: Erró el Tribunal de Primera Instancia al concluir que el despido del apelante fue resultado de una reorganización *bona fide*, a pesar de que durante el juicio Able Sales no presentó prueba suficiente que demostrara una disminución significativa en las ganancias o ventas que justificara el despido el despido del apelante.

En síntesis, planteó que Able Sales no demostró que la restructuración se debió a una respuesta legítima y necesaria para las circunstancias económicas y operacionales que enfrentaba la empresa.

El señor Pabón Alicea también radicó un *Alegato Suplementario de Efraín Pabón Alicea* el 30 de octubre de 2024. Arguyó que la licenciada Román Rivera y la señora Félix Pereira no pudieron proporcionar cifras concretas sobre las finanzas de la

---

[15] Sentencia, Apéndice del recurso, págs. 242-246.
[16] *Moción de Reconsideración, Íd.*, págs. 253-258.
[17] *Orden, Íd.*, pág. 259.

empresa, lo cual planteaba serias dudas sobre si el contrato con Pepsi representaba un 40% de los ingresos por servicios de almacenaje. El señor Pabón Alicea expuso que, según el testimonio de la señora Félix Pereira, la facturación de Pepsi fue de $1,504,126 anuales, y si tomaba en cuenta que Able Sales generaba 100 millones de dólares al año, dicha pérdida no era sustancial, y no justificaba una reorganización que culminara en su despido, pues representaba solo el 1.5% de las ganancias anuales de Able Sales.

Por su parte, Able Sales presentó un *Alegato de la Parte Apelada* el 19 de diciembre de 2024 donde sostuvo que el foro primario no incidió en ninguno de los errores, pues le mereció entera credibilidad al testimonio de la licenciada Román Rivera y al de la señora Félix Pereira, y que el señor Pabón Alicea no presentó prueba alguna para controvertir ni impugnar la prueba testifical ni documental de Able Sales. Añadió que el señor Pabón Alicea no fue el único que despidieron. Expuso que la tabla intitulada *Posible impacto de empleados* fue preparada en base a las funciones de cada posición,[18] los roles, las tareas de plazas regulares, mas no tomando en cuenta los empleados, y que, incluso, las plazas temporeras fueron eliminadas tan pronto confirmaron la pérdida de la cuenta. Por último, Able Sales señaló que la licenciada Román Rivera había preparado una presentación para los empleados notificando la reducción de beneficios, eliminación de posiciones, ajustes para mantenerse altamente competitivos, que habían negociado con suplidores y contratistas, entre otra información.[19]

## II.

## A.

Es norma conocida que los tribunales apelativos no intervendrán con las determinaciones de hechos ni las

---

[18] *Tabla*, Apéndice de la oposición al recurso, págs. 23-24.
[19] *Íd.*, págs. 25-29.

adjudicaciones de credibilidad realizadas por el TPI, al menos que dicho foro haya incurrido en error manifiesto, pasión, prejuicio o parcialidad.[20] Nuestro máximo Tribunal ha indicado que un juzgador incurre en pasión, prejuicio o parcialidad cuando actúa "movido por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que someta prueba alguna".[21] Por otra parte, incurre en error manifiesto cuando la apreciación de la prueba se aparta de la realidad fáctica o es inherentemente imposible o increíble.[22]

Asimismo, los tribunales superiores sólo podrán intervenir con las conclusiones cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico sobre la totalidad de la prueba.[23] Lo anterior se debe a que los jueces del foro primario son quienes están en mejor posición de aquilatar la prueba y adjudicar credibilidad incluyendo observar el comportamiento de los testigos mientras ofrecen su testimonio.[24] De hecho, "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley".[25] Sin embargo, los foros apelativos solo cuentan con "récords mudos e inexpresivos".[26] Por lo tanto, son pocos los casos en donde se ha concluido que el foro de instancia incurrió en pasión, prejuicio, parcialidad o error manifiesto.[27]

---

[20] *Rivera Menéndez v. Action Service*, 185 DPR 431, 444 (2012); *S.L.G. Rivera Carrasquillo v. A.A.A.*, 177 DPR 345, 356 (2009).

[21] *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 782 (2013).

[22] *Pueblo v. Toro Martínez*, 200 DPR 834, 859 (2018).

[23] *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011).

[24] *Ortiz Ortiz v. Medtronic Puerto Rico Operations, Co.*, 209 DPR 759, 778-779 (2022); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

[25] Regla 110 (D) de Evidencia, 32 LPRA VI, R. 110; *Rivera Menéndez v. Action Service*, supra, pág. 444; *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra, pág. 357.

[26] *Rivera Torres v. Díaz López*, 207 DPR 636, 658 (2021) (*citando a S.L.G. Rivera Carrasquillo v. A.A.A.*, supra, pág. 356).

[27] *Dávila Nieves v. Meléndez Marín*, supra, pág. 771.

Conforme a la Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". La intervención de un foro apelativo con la evaluación de la prueba testifical procede "'en casos en que un análisis integral de dicha prueba cause en nuestro ánimo una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia'".[28] Por ende, la parte apelante que cuestione una determinación de hechos realizada por el foro primario debe fundamentar la existencia de pasión, prejuicio o parcialidad, o error manifiesto.[29]

Ahora bien, a pesar de la deferencia judicial, cuando las conclusiones de hecho del TPI están basadas en prueba pericial o documental, el tribunal revisor se encuentra en la misma posición que el foro recurrido.[30] Ante tales circunstancias, el Tribunal Apelativo tendrá facultad para adoptar su propio criterio con relación a la apreciación y evaluación de la prueba pericial, e incluso para descartarla, aunque resulte técnicamente correcta.[31] De igual modo, podrán sustituir el criterio de los tribunales de primera instancia cuando, a tenor con la prueba admitida, no exista base suficiente que apoye su determinación.[32]

**B.**

Por otro lado, en nuestro sistema jurídico no se prohíbe el despido de un empleado.[33] Simplemente se protege el derecho del

---

[28] *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra, pág. 356 (*citando Pueblo v. Cabán Torres*, 117 DPR 645, 648 (1986)).

[29] *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra, pág. 356; *Flores v. Soc. de Gananciales*, 146 DPR 45, 50 (1998).

[30] *González Hernández v. González Hernández*, supra, pág. 777.

[31] *Íd.*; *Municipio de Loíza v. Sucns. De Suárez et al.*, 154 DPR 333, 363 (2001).

[32] *Pueblo v. Hernández Doble*, 210 DPR 850, 865 (2022); *Gómez Márquez v. Periódico el Oriental Inc.*, 203 DPR 783, 794 (2020).

[33] *Segarra Rivera v. Int'l. Shipping et al.*, 208 DPR 964, 982 (2022).

obrero a la tenencia de su empleo de una forma más efectiva, a la vez que se le otorga remedios más justicieros y esenciales, luego de un despido injustificado.[34] Por ejemplo, la Ley Núm. 80-1976 le impone al patrono el pago de una mesada, si se despide injustificadamente al empleado que trabaja a tiempo completo.[35] Por lo tanto, este estatuto busca proteger el derecho de los trabajadores frente a acciones arbitrarias y caprichosas de los patronos.[36]

Aun así, esta normativa no define el despido injustificado, empero, la Ley Núm. 80-1976 expone varias circunstancias que liberan al patrono de responsabilidad y constituyen justa causa.[37] Justa causa para el despido es aquella que no está motivada por razones legalmente prohibidas y que no sea producto del mero capricho del patrono. De igual modo, son aquellas razones que afectan el buen y normal funcionamiento de un establecimiento tal como los "[l]os cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público", conforme al Artículo 2 (e) de la Ley Núm. 80-1976.[38]

De este modo, el legislador reconoció que pueden surgir situaciones en el funcionamiento y manejo de los negocios que ameritan despedir su empleomanía por justa causa. Entre estas, la reorganización, la cual constituye una actuación del patrono respecto a la administración de su negocio, y ocurre por razones económicas que enfrenta su operación diaria.[39] Cabe mencionar que, "no se requiere necesariamente experimentar una reducción en el volumen de producción, las ventas o las ganancias de la empresa en su conjunto para que se justifique la reorganización".[40] El

---

[34] Ley Núm. 80-1976, supra (Exposición de Motivos).
[35] *Íd.*, sec. 185a; *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 983.
[36] Ley Núm. 80-1976, supra.
[37] Artículo 2 de la Ley Núm. 80-1976, supra, sec. 185b.
[38] *Íd.*
[39] *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 984.
[40] *Íd.*, pág. 1003.

patrono podrá tomar la decisión de reorganizar la empresa por cualquier motivo, siempre que se trate de una decisión empresarial válida, de utilidad y no por mero capricho.[41]

En el caso de la reorganización, el patrono puede cesantear a los empleados sin tener que pagar una indemnización.[42] Específicamente, nuestro más alto foro expresó que:

> Es claro que el Art. 2(e) de la Ley 80, *supra*, permite despedir empleados sin tener que pagar la compensación fijada por ese estatuto si esta decisión se toma como parte de una reorganización empresarial que así lo requiere. Un patrono puede modificar su forma de hacer negocios a través de algún tipo de cambio dirigido a optimizar sus recursos y aumentar las ganancias, ya sea eliminando plazas, creando otras nuevas o fusionando algunas ya existentes como vehículo para enfrentar problemas financieros o de competitividad, siempre que responda a una restructuración *bona fide*.[43]

A esos efectos, una reorganización *bona fide* es aquella que no es por mero capricho, sino que es producto del manejo de la empresa.[44]

Ahora bien, la única limitación que impone esta ley es retener con preferencia a los empleados de mayor antigüedad siempre que existan puestos vacantes u ocupados por empleados de menor antigüedad dentro de su misma clasificación ocupacional, y no entre clasificaciones ocupacionales distintas.[45] Aun así, nuestro Tribunal Supremo sostuvo que los cambios empresariales pueden acarrear el despido y el reclutamiento a la misma vez.[46]

Si la razón para el despido fue la reorganización empresarial, "la empresa no necesariamente tiene que alegar y probar que tuvo problemas económicos, sino que el patrono tiene que probar que, en efecto, se realizó una reorganización de buena fe y que, como parte de ese plan, el empleado fue despedido".[47] En otras palabras, el

---

[41] *Íd.*
[42] *Íd.*, pág. 1001.
[43] *SLG Zapata Rivera v. J.F. Montalvo*, 189 DPR 414, 426 (2013).
[44] *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 985.
[45] Artículo 3 de la Ley Núm. 80-1976, supra, sec. 185c; *Segarra Rivera v. Int'l. Shipping et al.*, supra, págs. 984-985.
[46] *Segarra Rivera v. Int'l. Shipping et al.*, supra, págs. 985-986.
[47] *Íd.*, pág. 1001.

patrono debe demostrar que la modificación de su forma de realizar negocios se hizo en consideración del buen y normal funcionamiento de la empresa. Asimismo, nuestro máximo foro sostuvo que:

> [N]o es función de los tribunales administrar los negocios ni aconsejar a los directores de estos sobre cómo manejar los asuntos de su empresa, siempre y cuando estas decisiones no estén motivadas por razones discriminatorias ni que mucho menos sean producto del mero capricho del patrono.[48]

(Énfasis en el original).

También resolvió que:

> Ahora bien, hoy aclaramos, y pautamos, que para demostrar justa causa basta con articular y presentar prueba sobre una razón válida para el despido, como por ejemplo sería la reorganización empresarial de los servicios rendidos al público. En ese sentido, la obligación que impone la Ley Núm. 80, supra, de probar efectivamente el proceso de reestructuración, no está sujeta a que se acredite la existencia de un proceso o un plan de reestructuración de una forma particular o *específica*. O sea, basta con que el patrono demuestre que la acción respondió a una decisión gerencial válida a la luz de las circunstancias y que no obedeció a un mero capricho o arbitrariedad, y así *tendrá que acreditarlo*.[49]

(Énfasis suplido en el original).

### III.

En el caso de marras debemos resolver si Able Sales despidió injustificadamente al señor Pabón Alicea o si se trató de un despido justificado por reorganización empresarial, conforme al inciso (e) del Artículo 2 de la Ley Núm. 80-1976.[50]

Luego de celebrar el juicio en su fondo, el foro primario determinó que el despido del señor Pabón Alicea fue por justa causa luego de una reorganización *bona fide* que llevó a cabo Able Sales. Resolvió que la empresa llevó a cabo un análisis sobre diferentes medidas para obtener ahorros en los gastos operacionales y que la reorganización se debió a la pérdida del contrato entre Able Sales y Pepsi. Continuó expresando que esta relación duró más de una década, por lo que tenían una expectativa de poder contar con las

---

[48] *Íd.*, pág. 1002.
[49] *Íd.*, págs. 1002-1003.
[50] Artículo 2 (e) de la Ley Núm. 80-1976, supra, sec. 185b.

ganancias millonarias que le generaba dicho contrato. Inclusive, el señor Pabón Alicea no fue el único en ser despedido como resultado de dicha reorganización, y no se retuvo personal alguno en la misma clasificación ocupacional que él. Consecuentemente, el TPI declaró No Ha Lugar la *Querella* instada y ordenó el cierre definitivo y archivo, con perjuicio, del caso de epígrafe.

En desacuerdo, el señor Pabón Alicea sostuvo que incidió el foro primario, pues Able Sales no demostró que la restructuración fuera necesaria para las circunstancias operacionales que enfrentaba la empresa. Arguyó que, tomando en cuenta que Able Sales generaba 100 millones de dólares al año, la pérdida del contrato de Pepsi no fue sustancial y no justificó una restructuración que culminara con su despido.

Por su parte, Able Sales expuso que el señor Pabón Alicea no presentó prueba alguna para controvertir ni impugnar la prueba testifical ni documental.

Según la sección anterior, una de las razones que constituye justa causa para el despido de un empleado a tiempo completo es "[l]os cambios tecnológicos o de reorganización, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público", conforme al Artículo 2 (e) de la Ley Núm. 80-1976.[51] (Énfasis suplido). La reorganización constituye una actuación relacionada a la administración del negocio y no es función de los tribunales administrar los negocios ni aconsejar a los directores sobre la forma en que deben manejar las empresas, siempre y cuando dichas decisiones estén motivadas por razones discriminatorias, ni sean por mero capricho del patrono. A esos efectos, un patrono puede modificar la forma de realizar sus

---

[51] *Íd.*

negocios mediante algún cambio para optimizar sus recursos y aumentar las ganancias incluyendo la eliminación de plazas o fusiones de algunas existentes, mientras responda a una restructuración *bona fide*. Es decir, aquella que no sea por mero capricho, sino que sea producto del manejo de la empresa.

Ciertamente, el patrono puede tomar la determinación de reorganizar la empresa por cualquier motivo, mientras se trate de una decisión empresarial válida y de utilidad. Inclusive, no es necesario que la compañía experimente una reducción en el volumen de producción, las ventas o las ganancias de la empresa para justificar la restructuración. Si la razón para el despido fue la reorganización empresarial, "la empresa no necesariamente tiene que alegar y probar que tuvo problemas económicos, sino que el patrono tiene que probar que, en efecto, se realizó una reorganización de buena fe y que, como parte de ese plan, el empleado fue despedido".[52] Por lo tanto, el patrono debe demostrar que la modificación de su forma de realizar negocios se hizo en consideración del buen y normal funcionamiento de la empresa. Tal como resolvió nuestro más alto foro:

> [P]ara demostrar justa causa basta con articular y presentar prueba sobre una razón válida para el despido, como por ejemplo sería la reorganización empresarial de los servicios rendidos al público. En ese sentido, la obligación que impone la Ley Núm. 80, supra, de probar efectivamente el proceso de reestructuración, no está sujeta a que se acredite la existencia de un proceso o un plan de reestructuración de una forma particular o *específica*. O sea, basta con que el patrono demuestre que la acción respondió a una decisión gerencial válida a la luz de las circunstancias y que no obedeció a un mero capricho o arbitrariedad, y así *tendrá que acreditarlo*.[53]

(Énfasis suplido en el original).

En el presente caso, no encontramos fundamento alguno en la prueba documental, testifical e incluso en los propios argumentos del señor Pabón Alicea para determinar que su despido fue

---

[52] *Segarra Rivera v. Int'l. Shipping et al.*, supra, pág. 1001.
[53] *Íd.*, págs. 1002-1003.

injustificado y caprichoso. Todo lo contrario. La razón del despido fue la reorganización de Able Sales en vista de la pérdida del contrato millonario de Pepsi, luego del cierre de esta última en Puerto Rico. Incluso, tal despido no fue el único ni fue la primera medida tomada por Able Sales para aminorar y/o evitar un impacto adverso a los negocios y operaciones de la empresa. La empresa, mediante licenciada Román Rivera, evaluó primero los contratistas; luego los beneficios de los empleados; y finalmente, la terminación de empleos.[54] Además, nadie sustituyó al señor Pabón Alicea en su puesto, y las funciones de *Key Accountant Manager* eran incompatibles y requerían de mayores destrezas que la de Supervisor de Ventas.[55] Por lo tanto, el despido del señor Pabón Alicea fue justificado por la restructuración bona fide de Able Sales conforme al inciso (e) del Artículo 2 de la Ley Núm. 80-1976.[56]

Ciertamente no cae bajo las funciones de esta Curia explicarle a una empresa cómo manejar sus negocios y cómo llevar a cabo una restructuración *bona fide*. Solo tenemos que evaluar si el patrono tuvo una razón válida para atender el bienestar de la empresa, conforme a la prueba presentada. En el caso de marras, dicha razón fue la cancelación del contrato millonario de Pepsi.

A la luz de lo anteriormente expuesto, le otorgamos deferencia al foro primario con relación a la determinación de hechos y apreciación de la prueba testifical, y resolvemos que el foro primario no incidió en ninguno de los errores señalados por el señor Pabón Alicea.

Consecuentemente, confirmamos la fundamentada *Sentencia* apelada.

---

[54] TPO del 29 de enero de 2024, pág. 24, L 9-27.
[55] TPO del 30 de enero de 2024, págs. 12-22.
[56] Artículo 2 (e) de la Ley Núm. 80-1976, supra, sec. 185b.

**IV.**

En virtud de lo anterior, *se confirma* la *Sentencia* apelada.

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

La Jueza Cintrón Cintrón concurre sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones